E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
IAN YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, General Crimes Section
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1200/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:     (213) 894-3667/0762
Facsimile:     (213) 894-0141
E-mail:   Ian.Yanniello@usdoj.gov
          Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

```
                FILED
        CLERK, U.S. DISTRICT COURT

        8-8-2024

    CENTRAL DISTRICT OF CALIFORNIA
    BY: ___PG___ DEPUTY
```

SEALED

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

KENNETH IWAMASA,

    Defendant.

No. CR **2:24-CR-00408-SPG**

AMENDED PLEA AGREEMENT FOR DEFENDANT KENNETH IWAMASA

1.   This constitutes the plea agreement between KENNETH IWAMASA ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") related to the investigation of the drug overdose death of Victim M.P.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.    Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to an information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with conspiracy to distribute ketamine resulting in death and serious bodily injury, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(E)(i).

b.    Not contest facts agreed to in this agreement.

c.    Abide by all agreements regarding sentencing contained in this agreement.

d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.    Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.    Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.    Defendant understands that the government obtained additional material in this investigation that defendant has not been shown.  In exchange for the government's obligations under this agreement, defendant gives up any right he may have had to review the additional material, regardless of whether it is arguably exculpatory or inculpatory, and further agrees to waive any argument that the

withholding of this material caused defendant's plea to be not knowing or involuntary.  The government agrees not to use at sentencing any of the withheld material without providing it to defendant.

3.    Defendant further agrees to cooperate fully with the USAO, the Drug Enforcement Administration, the United States Postal Inspection Service, the Los Angeles Police Department, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority. This cooperation requires defendant to:

a.    Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b.    Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c.    Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

4.    For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement or pursuant to the letter agreement previously entered into by the parties dated April 26, 2024 (the "Letter Agreement"); and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

6.    The USAO further agrees:

a.    Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.    Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline

4

range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed. Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.    In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.    If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

7.    Defendant understands the following:

a.    Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.    Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory

5

authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c. Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d. At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance. The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e. The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

<u>NATURE OF THE OFFENSES</u>

8. Defendant understands that for defendant to be guilty of the crime charged in count one of the information, that is, conspiracy to distribute ketamine resulting in death and serious bodily injury, in violation of Title 21, U.S. Code Sections 846, 841(a)(1), and (b)(1)(E)(i), the following must be true: (1) there was an agreement between two or more persons to distribute ketamine, a Schedule III controlled substance; and (2) defendant joined in that agreement knowing of its purpose and intending to help accomplish that purpose.

9. Defendant understands that for defendant to be subject to the statutory maximum sentence set forth below, the government must prove beyond a reasonable doubt that the use of ketamine distributed by the conspiracy caused serious bodily injury or death of another, namely, Victim M.P., as alleged in the information, pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i). Defendant admits that defendant, in fact, distributed ketamine to Victim M.P. during the conspiracy and that such ketamine caused Victim M.P.'s death.

PENALTIES

10. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of conspiracy to distribute ketamine resulting in death and serious bodily injury, in violation of Title 21, U.S. Code, Sections 846, 841(a)(1), (b)(1)(E)(i), is: 15 years imprisonment; a 3-year period of supervised release; a fine of $500,000 $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

11. Defendant understands that under 21 U.S.C. § 862a, defendant will not be eligible for assistance under state programs funded under the Social Security Act or Federal Food Stamp Act or for federal food stamp program benefits, and that any such benefits or assistance received by defendant's family members will be reduced to reflect defendant's ineligibility.

12. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part

7

of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

14. Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States. Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case. Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and

that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his conviction on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

<u>FACTUAL BASIS</u>

15.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 18 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

At all relevant times to this factual basis, defendant was the live-in personal assistant to Victim M.P. In this role, defendant had various responsibilities related to Victim M.P.'s medical care, including coordinating medical appointments and taking steps to ensure that Victim M.P. took the medication that Victim M.P. was lawfully prescribed by treating physicians. Victim M.P. had a history of drug abuse and addiction, and had sought on multiple occasions assistance to treat his drug addiction and to maintain his sobriety. However, beginning in or around September 2023, Victim M.P. requested defendant's assistance procuring illegal drugs for Victim M.P.'s personal use. To that end, Victim M.P. provided defendant with money, or promised to reimburse him, and directed him to find sources from whom to acquire the drugs.

9

Specifically, beginning on an unknown date but no later than in or around September 2023, and continuing until at least the date of Victim M.P.'s death on October 28, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant conspired with others known and unknown, including Salvador PLASENCIA ("Co-Conspirator PLASENCIA") and Erik FLEMING ("Co-Conspirator FLEMING"), to knowingly and intentionally distribute ketamine, a schedule III federally controlled substance, to Victim M.P. Defendant joined the agreement knowing of its purpose and intending to help accomplish its purpose.

**Defendant Conspires with PLASENCIA to Obtain and Distribute Ketamine**

On or about September 30, 2023, Individual 1 introduced Victim M.P. to Co-Conspirator PLASENCIA as a possible source of ketamine supply. Individual 1 identified Co-Conspirator PLASENCIA as a medical doctor who went by the name, "Dr. P." On September 30, 2023, Victim M.P. communicated with Co-Conspirator PLASENCIA to purchase liquid ketamine and ketamine lozenges from Co-Conspirator PLASENCIA.  Later that day, Co-Conspirator PLASENCIA traveled to a residence belonging to Victim M.P., located in the Central District of California, where PLASENCIA met with defendant and Victim M.P.  Co-Conspirator PLASENCIA injected Victim M.P. with approximately two shots of ketamine that Co-Conspirator PLASENCIA administered approximately 15 minutes apart.

While at Victim M.P.'s residence, Co-Conspirator PLASENCIA gave instructions to defendant about how to administer ketamine through an intramuscular injection, including where to make injections on Victim M.P.'s body.  Before leaving the residence, Co-Conspirator PLASENCIA provided multiple syringes to defendant and Victim M.P. so that they

could self-administer the ketamine to Victim M.P., and left behind at least one vial of ketamine with liquid still remaining in it. Defendant paid Co-Conspirator PLASENCIA approximately $4,500 in cash for ketamine.

At the time that Co-Conspirator PLASENCIA sold the ketamine to defendant and Victim M.P., Co-Conspirator PLASENCIA was aware that defendant did not have medical training or experience administering and/or treating patients who were under the influence of controlled substances. Co-Conspirator PLASENCIA did not stay to observe Victim M.P. and left approximately five minutes after administering the second dose of ketamine.

Subsequently, Victim M.P. directed defendant to obtain more ketamine from PLASENCIA. On October 2, 2023, in text messages, defendant began communicating with Co-Conspirator PLASENCIA about purchasing additional ketamine from Co-Conspirator PLASENCIA.  At approximately 5:47 p.m. on October 2, Co-Conspirator PLASENCIA sent text messages to defendant stating, "For 8 treatments we can just make it an even 25k" and "I will bring needles of higher gauge." In response, defendant explained that Victim M.P. was interested in purchasing 8 vials of ketamine, not ketamine treatments, stating: "Want to end up with 8 bottles of dr pepper, not just 8 sessions." Co-Conspirator PLASENCIA confirmed he "Understood."  On or before October 2, defendant also purchased ketamine lozenges from Co-Conspirator PLASENCIA in exchange for approximately $2,000.

On October 4, 2023, defendant told Co-Conspirator PLASENCIA he needed additional vials of ketamine, stating; "I will need to get more cans of dr pepper from you today, I can come to you to make it convenient." Defendant also informed Co-Conspirator PLASENCIA that

defendant had successfully injected Victim M.P. with ketamine, stating: "Found the sweet spot but trying different places led to running out" of ketamine. In response, Co-Conspirator PLASENCIA said "I have ideas on how to get consistent results" and confirmed he would deliver more ketamine to defendant on October 4. Later on October 4, at approximately 12:20 p.m., defendant told Co-Conspirator PLASENCIA "I need some [ketamine] now can I come to you please[?]" After Co-Conspirator PLASENCIA confirmed he was on his way to acquire more ketamine from his source, which Co-Conspirator PLASENCIA advised was an individual in San Diego, California, defendant stated the following: "How many cans are you bringing? And when do you think youd be here?"  Co-Conspirator PLASENCIA confirmed that he was "currently retrieving 4 bottles."  Co-Conspirator PLASENCIA arrived to Victim M.P.'s primary residence, located in the Central District of California, at approximately 5:55 p.m. on October 4, 2023.  At the residence, Co-Conspirator PLASENCIA injected Victim M.P. with ketamine and sold additional ketamine to Victim M.P. in exchange for payment. Co-Conspirator PLASENCIA left the residence shortly after injecting Victim M.P. with ketamine.

On October 6, 2023, defendant again communicated with Co-Conspirator PLASENCIA about acquiring more ketamine for Victim M.P., stating: "Do you have the other 2 of the 8 or any tonight?" Co-Conspirator PLASENCIA responded, "About tonight I may be able to get you those remaining two tonight" and "How late is too late?" Defendant confirmed that "[i]ts never too late if that's the soonest, meanwhile I have 1 left."  That night, Co-Conspirator PLASENCIA traveled to Victim M.P.'s residence and injected Victim M.P. with

ketamine before selling one or more vials of ketamine in exchange for a cash payment.

The following day, on October 7, 2023, defendant reached out to Co-Conspirator PLASENCIA again to ask if Co-Conspirator PLASENCIA could provide more ketamine. Co-Conspirator PLASENCIA confirmed he could, stating, "I can get more yes" and "How soon do you need them?" Defendant responded: "Tomorrow morning probably" and asked if he could pay Co-Conspirator PLASENCIA with "something besides cash" since "[i]ts hard to get to the bank on the fly with all thats going on which happens so fast now." In response, Co-Conspirator PLASENCIA agreed to deliver more ketamine the following day.

A short time later, however, defendant informed Co-Conspirator PLASENCIA "I just ran out" of ketamine and asked if he could meet Co-Conspirator PLASENCIA to obtain more. At approximately 11:29 p.m., Co-Conspirator PLASENCIA confirmed he had two bottles of ketamine to sell to defendant and agreed to meet in Santa Monica, California, stating: "Im at third street promenade now … If [y]ou would like to meet now." At 11:47 p.m., defendant told Co-Conspirator PLASENCIA he sent $3,000 by electronic payment and "im bringing 3 more leaving now." At approximately 12:30 a.m. on October 8, 2023, Co-Conspirator PLASENCIA sold defendant two vials of ketamine for approximately $6,000.

Between October 9 and 10, 2023, in text messages, defendant and Co-Conspirator PLASENCIA continued to communicate about obtaining more ketamine. On October 10, 2023, Co-Conspirator PLASENCIA agreed to meet defendant and Victim M.P. at a parking lot located in Long Beach, California, to transfer additional ketamine to defendant. Defendant drove Victim M.P. to the arranged meeting location and

parked the car while waiting for Co-Conspirator PLASENCIA to arrive. At the time, Victim M.P. was sitting in the back seat of the car. When Co-Conspirator PLASENCIA arrived, he entered the back seat of the car and injected Victim M.P. with a shot of ketamine. After injecting Victim M.P., Co-Conspirator PLASENCIA gave defendant and Victim M.P. multiple vials of ketamine and got out of the vehicle.

On October 12, 2023, Victim M.P. received a ketamine infusion treatment from a medical doctor ("Individual 2"), at Individual 2's office. After the treatment, defendant contacted Co-Conspirator PLASENCIA to purchase additional ketamine from Co-Conspirator PLASENCIA. Defendant also told Co-Conspirator PLASENCIA "I have your cash sorry for the wait," referring to payment for ketamine that Co-Conspirator PLASENCIA had previously transferred on October 10. Co-Conspirator PLASENCIA responded "no problem" and agreed to meet defendant later that evening. Co-Conspirator PLASENCIA later traveled to Victim M.P.'s primary residence and met with Victim M.P. and defendant. After Co-Conspirator PLASENCIA administered a large dose of ketamine to Victim M.P., Victim M.P. experienced an adverse medical reaction. Among other things, the ketamine caused a significant spike to Victim M.P.'s systolic blood pressure and caused Victim M.P.'s body to "freeze up" such that Victim M.P. could not talk or move. Co-Conspirator PLASENCIA and defendant then struggled to move Victim M.P. onto a couch. During the event, Co-Conspirator PLASENCIA stated something to the effect of, "let's not do that again." Co-Conspirator PLASENCIA subsequently left the residence after leaving additional vials of ketamine for defendant to administer to Victim M.P.

On October 27, 2023, in text messages, Co-Conspirator PLASENCIA

14

offered to sell additional ketamine to defendant, stating: "Hi. I know you mentioned taking a break. I have been stocking up on the meanwhile. I am not sure when you guys plan to resume but in case its when im out of town this weekend I have left supplies with a nurse of mine." Co-Conspirator PLASENCIA clarified in a follow-up text message: "I can always let her know the plan. I will be back in town Tuesday."

In total, between September 30 to October 28, 2023, defendant met with Co-Conspirator PLASENCIA on no less than seven occasions to obtain ketamine from Co-Conspirator PLASENCIA. In total, defendant paid Co-Conspirator PLASENCIA at least $55,000 of Victim M.P.'s money to purchase liquid ketamine and ketamine lozenges.

**Defendant Conspires with FLEMING to Obtain and Distribute Ketamine**

Beginning on or about October 10, 2023, defendant and Victim M.P. began looking for additional sources of ketamine for Victim M.P. On October 10, 2023, defendant sent a text message to Co-Conspirator FLEMING to ask about purchasing ketamine, stating: "Hey Erik, Alfred here batmans butler He said I can text you directly. How much do you want per bottle and what is the nice tip you want." Co-Conspirator FLEMING responded, "perfect- and ill bring to you" and "Getting price now. I need some upfront to pay when I pick up. And rest when I deliver." Co-Conspirator FLEMING subsequently told defendant via text messages that he could obtain 10ml vials of ketamine for $300 and requested a $1,000 brokering fee.

Over the next few days, defendant and Co-Conspirator FLEMING continued to discuss obtaining ketamine to distribute to Victim M.P. On October 10, Co-Conspirator FLEMING forwarded a screenshot of text messages he exchanged with his ketamine source that stated, "It's

15

unmarked but it's amazing – he take one and try it and I have more if he likes."  Co-Conspirator FLEMING clarified that the message was from his ketamine dealer, noting: "[j]ust got this from my person. She only deal[s] with high end and celebs. If it were not great stuff she'd lose her business."  Co-Conspirator FLEMING subsequently agreed to obtain a sample of ketamine from his drug supplier and deliver it to defendant in exchange for $180. Defendant agreed to purchase the ketamine and told Co-Conspirator FLEMING:

> "If it works [Victim M.P. will] probably want all the supply, only interested in the unmarked ones not the horsey version. Confirm with supply that the unmarked one is u.s. non veterinary supply or whatever they will tell you when you ask."

On October 13, 2023, Co-Conspirator FLEMING drove to Victim M.P.'s residence and delivered a sample vial of ketamine to defendant in exchange for payment.  A short time later, defendant sent a text message to Co-Conspirator FLEMING describing Victim M.P.'s response to the ketamine, stating "seems good ... What number of bots does she have?", referring to Co-Conspirator FLEMING's ketamine supplier.  Co-Conspirator FLEMING responded, "As many as u want" and "Let me know how many he wants and I'll confirm what she can get. But as of now she said she can fill any order." In response, defendant stated he would purchase the following for Victim M.P.: "25 vials $5500 @220 +500 for you for logistics." On October 14, 2023, Co-Conspirator FLEMING delivered 25 vials of ketamine to defendant in exchange for approximately $6,000, paid with Victim M.P.'s money.

On October 23, 2023, defendant sent a text message to Co-Conspirator FLEMING to purchase more ketamine, stating: "Can we do same as last time again over next 2 days?"  Co-Conspirator FLEMING confirmed he could obtain the ketamine, stating: "It will be same

product. You want same amount? Put the 5500 together asap and ill come get it as soon as possible to get it all done tonight." Co-Conspirator FLEMING traveled to Victim M.P.'s primary residence at approximately 8 p.m. on October 23 and picked up approximately $6,000 in cash from defendant.  Defendant understood that $5,500 of the cash he paid was to be delivered by Co-Conspirator FLEMING to Co-Conspirator FLEMING's drug source, and defendant separately paid $500 to Co-Conspirator FLEMING as Co-Conspirator FLEMING's cut for brokering the deal.

On October 24, 2023, in text messages, defendant and Co-Conspirator FLEMING communicated about Co-Conspirator FLEMING acquiring the ketamine from his drug source.  At approximately 10:47 a.m., Co-Conspirator FLEMING told defendant, "It's on its way to our girl. I should have an ETA anytime soon."  Co-Conspirator FLEMING subsequently picked up 25 vials of ketamine from his drug source and delivered the ketamine to defendant at Victim M.P.'s residence at approximately 10:52 p.m.

**Defendant Administers Multiple Injections of Ketamine on October 28, 2023, Resulting in the Death of Victim M.P.**

In the days leading up to October 28, 2023, at Victim M.P.'s direction, defendant injected Victim M.P. with significant quantities of ketamine.  For example, between October 24 and October 27, 2023, defendant injected Victim M.P. with approximately 6-8 shots per day. During the month of October, 2023, defendant found Victim M.P. unconscious at his residence on at least two occasions.

On October 28, 2023, at Victim M.P.'s direction, defendant injected Victim M.P. with a shot of ketamine at approximately 8:30 a.m.  At approximately 12:45 p.m., defendant injected Victim M.P.

17

with a second ketamine shot while Victim M.P. watched a movie. Approximately 40 minutes later, Victim M.P. asked defendant to prepare the jacuzzi for Victim M.P. and told defendant, "shoot me up with a big one," referring to another shot of ketamine. Defendant filled a syringe with ketamine and administered it to Victim M.P. while Victim M.P. was in or near the jacuzzi.  All of the ketamine defendant administered to Victim M.P. on October 28, 2023 had been provided by Co-Conspirator FLEMING and his drug source.

Soon after injecting Victim M.P. with the third shot of ketamine, defendant left the residence to run errands for Victim M.P. After returning to the residence, defendant found Victim M.P. face down in the jacuzzi and deceased.  The Los Angeles County Medical Examiner Medical conducted an autopsy and determined that Victim M.P. had a significant amount of ketamine in his blood and that his death resulted from the "acute effects of ketamine."  Defendant admits that Victim M.P.'s death was due to effects of ketamine and that but for the presence of ketamine in Victim M.P.'s bloodstream, Victim M.P. would not have died on October 28, 2023.  Victim M.P.'s death was a natural and foreseeable consequence of the conspiracy based on, among other things, the frequency and amount of ketamine that defendant was administering to Victim M.P., defendant's observations of Victim M.P.'s adverse reactions to ketamine injections in October 2023, and the fact that defendant was administering ketamine injections to Victim M.P. with no medical training, or any access to medical equipment necessary to counteract an adverse reaction to ketamine.

<u>SENTENCING FACTORS</u>

16.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing

Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

17.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:          26     [U.S.S.G. § 2D1.1(A)(4)]

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

18.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.    The right to be represented by counsel – and if necessary have the Court appoint counsel - at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

20.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that

the statement of facts provided herein is insufficient to support defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

21. Defendant agrees that, provided the Court imposes a total term of imprisonment within or below the range corresponding to an offense level of 23 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

22. Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty

is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

23. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 23 and the criminal history calculated by the Court, the USAO gives up its right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

24. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of

this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

25.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

26.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.    If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.    The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.    The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.    In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of

24

Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

27. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

28. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 17 are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

29. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

30. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

31. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney

*Ian V. Yanniello*                          6/27/2024
IAN V. YANNIELLO                             Date
HAOXIAOHAN CAI
Assistant United States Attorneys

_____                      6/27/2024
KENNETH IWAMASA                              Date
Defendant

_____                      6-27-2024
ALAN EISNER                                  Date
Attorney for Defendant KENNETH
IWAMASA

8/8/24 Interlineation on page 7 K.I.

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences

27

of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     ___6/27/2024_____
KENNETH IWAMASA                      Date
Defendant

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am KENNETH IWAMASA's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this

28

agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____

ALAN EISNER
Attorney for Defendant KENNETH
IWAMASA

6-27-2024

Date

29

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [21 U.S.C. § 846: Conspiracy to Distribute Ketamine Resulting in Death and Serious Bodily Injury] |
| KENNETH IWAMASA, | |
| Defendant. | |

The United States Attorney charges:

[21 U.S.C. § 846]

A.    INTRODUCTORY ALLEGATIONS

At all relevant times to this Information:

1.    Defendant KENNETH IWAMASA was a resident of Los Angeles County and employed as the live-in personal assistant to Victim M.P. In this role, defendant IWAMASA had various responsibilities related to Victim M.P.'s medical care, including coordinating medical appointments and taking steps to ensure that Victim M.P. took the medication that Victim M.P. was lawfully prescribed by treating physicians.

2.    Defendant IWAMASA was aware that Victim M.P. had a history of drug abuse and addiction, and that Victim M.P. had sought on

multiple occasions assistance to treat his drug addiction and to maintain his sobriety.

3. Co-Conspirator 1 was a medical doctor known as "Dr. P," and was a resident of Santa Monica, California.

4. Co-Conspirator 2 was a resident of Hawthorne, California.

B. OBJECT OF THE CONSPIRACY

Beginning on a date unknown and continuing until at least on or about October 28, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant IWAMASA conspired with others known and unknown to the United States Attorney, to knowingly and intentionally distribute ketamine, a Schedule III controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i).

The distribution of said ketamine that was the object of the conspiracy resulted in the death and serious bodily injury of Victim M.P.

C. MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, in substance, as follows:

1. Defendant IWAMASA would communicate with other co-conspirators, including Co-Conspirators 1 and 2, about purchasing ketamine to distribute to Victim M.P.

2. Defendant IWAMASA would meet with co-conspirators, including Co-Conspirators 1 and 2, to purchase ketamine for Victim M.P.

3. Knowing that defendant IWAMASA did not have medical training nor experience administering and/or treating persons who were under the influence of controlled substances, Co-Conspirator 1

2

would teach defendant IWAMASA how to inject Victim M.P. with ketamine.

4.    At Victim M.P.'s request, defendant IWAMASA would inject Victim M.P. with the ketamine defendant IWAMASA obtained from Co-Conspirators 1 and 2.

5.    On October 28, 2023, defendant IWAMASA injected Victim M.P. with the ketamine defendant IWAMASA received from Co-Conspirator 2, resulting in the death and serious bodily injury of Victim M.P.

D.    OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant IWAMASA and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On September 30, 2023, defendant IWAMASA and Victim M.P. met with Co-Conspirator 1, who went by the name of "Dr. P.," at a residence belonging to Victim M.P., in Los Angeles County, for the purpose of obtaining ketamine from Co-conspirator 1 for Victim M.P.'s use.

Overt Act No. 2:    On September 30, 2023, after injecting Victim M.P. with two shots of ketamine, Co-Conspirator 1 instructed defendant IWAMASA how to administer ketamine via syringe to Victim M.P., including where to make injections on Victim M.P.'s body, and left behind at least one vial of ketamine and multiple syringes.

Overt Act No. 3:    On September 30, 2023, defendant IWAMASA paid Co-Conspirator 1 approximately $4,500 for the ketamine.

Overt Act No. 4:    On October 2, 2023, in response to a text message, in coded language, from defendant IWAMASA requesting to buy

3

8 vials of ketamine, "Want to end up with bottles of dr pepper, not just 8 sessions," Co-Conspirator 1 responded that he "Understood."

Overt Act No. 5:    On or about October 2, 2023, defendant IWAMASA purchased ketamine lozenges from Co-Conspirator 1 for approximately $2,000.

Overt Act No. 6:    On October 4, 2023, defendant IWAMASA sent Co-Conspirator 1 text messages stating, in coded language, that he had successfully injected Victim M.P. and that he needed to buy more vials of ketamine: "I will need to get more cans of dr pepper from you today, I can come to you to make it convenient."

Overt Act No. 7:    On October 4, 2023, in response to defendant IWAMASA's text messages requesting to purchase ketamine "now," Co-Conspirator 1 advised that he was "currently retrieving 4 bottles," which he was getting from his source.

Overt Act No. 8:    On October 4, 2023, Co-Conspirator 1 injected Victim M.P. with ketamine and in addition sold defendant IWAMASA multiple vials of ketamine.

Overt Act No. 9:    On October 6, 2023, in response to defendant IWAMASA advising Co-Conspirator 1 that he needed more ketamine because he only had "1 left," Co-Conspirator 1 traveled to Victim M.P.'s residence, injected Victim M.P. with ketamine, and sold one or more vials of ketamine to defendant IWAMASA for a cash payment.

Overt Act No. 10:    On October 7, 2023, defendant IWAMASA sent text messages to Co-Conspirator 1 seeking more ketamine and asked if he could pay with "something besides cash" because "[i]ts hard to get to the bank on the fly with all that's going on which happens so fast now."

4

Overt Act No. 11:   On October 7, 2023, at approximately 11:29 p.m., and in response to text messages from defendant IWAMASA, Co-Conspirator 1 confirmed that he had two bottles of ketamine to sell to defendant and agreed to meet in Santa Monica, California, stating: "Im at third street promenade now … If [y]ou would like to meet now."

Overt Act No. 12:   On October 7, 2023, at approximately 11:47 p.m., defendant IWAMASA told Co-Conspirator 1 that he sent $3,000 by electronic payment and that "im b ringing 3 more leaving now."

Overt Act No. 13:   On October 8, 2023, at approximately 12:30 a.m., Co-Conspirator 1 sold defendant two vials of ketamine for $6,000.

Overt Act No. 14:   On October 10, 2023, defendant IWAMASA drove Victim M.P. to meet with Co-conspirator 1 in a public parking lot in Long Beach, California, where Co-Conspirator 1 was given cash, as a partial payment, for injecting Victim M.P. with ketamine in the back of the car and for providing defendant IWAMASA with additional vials of ketamine.

Overt Act No. 15:   On October 10, 2023, defendant IWAMASA sent a text message to Co-Conspirator 2 seeking to purchase ketamine, stating: "How much do you want per bottle and what is the nice tip you want."

Overt Act No. 16:   On October 10, 2023, in response to the text message referenced in Overt Act No. 15, Co-Conspirator 2 stated, "perfect- and ill bring to you" and "Getting price now. I need some upfront to pay when I pick up. And rest when I deliver."

Overt Act No. 17:   On October 10, 2023, Co-Conspirator 2 also told defendant IWAMASA via text messages that he could obtain 10ml vials of ketamine for $300 and requested a $1,000 brokering fee.

Overt Act No. 18:   On October 12, 2023, referring to the remaining payment from the transaction referred to in Overt Act No. 14, defendant IWAMASA texted Co-conspirator 1, "I have your cash sorry for the wait," and asked to purchase additional ketamine.

Overt Act No. 19:   On October 12, 2023, defendant IWAMASA requested that Co-Conspirator 1 come to Victim M.P.'s residence to inject Victim M.P. with ketamine, even though, as defendant IWAMASA knew, Victim M.P. had just received a ketamine infusion treatment earlier that day from a medical doctor at the doctor's office.

Overt Act No. 20:   On October 12, 2023, after Co-Conspirator 1 administered a large dose of ketamine to Victim M.P. which caused an adverse medical reaction, including a significant spike to Victim M.P.'s systolic blood pressure and causing him to freeze up, such that Victim M.P. could not speak or move, Co-conspirator 1 stated to defendant IWAMASA something to the effect of: "let's not do that again."

Overt Act No. 21:   On October 13, 2023, Co-Conspirator 2 drove to Victim M.P.'s residence and delivered a sample vial of ketamine to defendant IWAMASA in exchange for payment.

Overt Act No. 22:   On October 13, 2023, in response to defendant IWAMASA asking Co-Conspirator 2 how many bottles of ketamine Co-Conspirator 2 could obtain, Co-Conspirator 2 stated, "As many as u want" and "Let me know how many ... and I'll confirm what [Co-Conspirator 2's ketamine source] can get. But as of now," the ketamine source "can fill any order."

Overt Act No. 23:   On October 13, 2023, in response to the text messages referenced in Overt Act No. 22, defendant IWAMASA told Co-

6

Conspirator 2 he would purchase "25 vials $5500 @220 +500 for you for logistics."

Overt Act No. 24:   On October 14, 2023, Co-Conspirator 2 drove to Victim M.P.'s residence and sold defendant IWAMASA 25 vials of ketamine for approximately $6,000.

Overt Act No. 25:   On October 23, 2023, defendant IWAMASA sent a text message to Co-Conspirator 2 requesting to purchase more ketamine, stating: "Can we do same as last time again over next 2 days?"

Overt Act No. 26:   On October 23, 2023, in response to the text message referenced in Overt Act No. 25, Co-Conspirator 2 confirmed he could obtain more ketamine, stating: "It will be same product. You want same amount? Put the 5500 together asap and ill come get it as soon as possible to get it all done tonight."

Overt Act No. 27:   On October 23, 2023, Co-Conspirator 2 traveled to Victim M.P.'s residence at approximately 8 p.m. and picked up approximately $6,000 in cash from defendant IWAMASA, which would be used to pay Co-Conspirator 2's ketamine source for additional ketamine.

Overt Act No. 28:   On October 24, 2023, Co-Conspirator 2 texted defendant IWAMASA that the cash for the ketamine purchase was on its way to Co-Conspirator 2's source of ketamine: "It's on its way to our girl. I should have an ETA anytime soon."

Overt Act No. 29:   On October 24, 2023, Co-Conspirator 2 traveled to Victim M.P.'s residence with at least 25 vials of ketamine which he delivered to defendant IWAMASA.

Overt Act No. 30:   On October 24, 2023, defendant IWAMASA administered at least 6 shots of ketamine to Victim M.P.

Overt Act No. 31:   On October 25, 2023, defendant IWAMASA administered at least 6 shots of ketamine to Victim M.P.

Overt Act No. 32:   On October 26, 2023, defendant IWAMASA administered at least 6 shots of ketamine to Victim M.P.

Overt Act No. 33:   On October 27, 2023, defendant IWAMASA administered at least 6 shots of ketamine to Victim M.P.

Overt Act No. 34:   On October 27, 2023, Co-Conspirator 1 offered to sell additional ketamine to defendant IWAMASA to be distributed to Victim M.P.: "Hi. I know you mentioned taking a break. I have been stocking up on the meanwhile. I am not sure when you guys plan to resume but in case its when im out of town this weekend I have left supplies with a nurse of mine," and followed up in a later message: "I can always let her know the plan. I will be back in town Tuesday."

///

///

8

Overt Act No. 35:   On October 28, 2023, defendant IWAMASA administered at least 3 shots of ketamine to Victim M.P., resulting in the death and serious bodily injury of Victim M.P.

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

IAN V. YANNIELLO
Assistant United States Attorney
Chief, General Crimes Section

HAOXIAOHAN CAI
Assistant United States Attorney
Major Frauds Section

9

## CERTIFICATE OF SERVICE

I, **Abigail M. Haun**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**PLEA AGREEMENT FOR DEFENDANT KENNETH IWAMASA**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☒ Via email, as follows:

☐ By Federal Express, as follows:

**alan@EGattorneys.com**

**thebestdefense@gmail.com**

This Certificate is executed on **July 5, 2024,** at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

*Abigail M. Haun*
Abigail M. Haun
Legal Assistant